**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jorge Felix Ibarra-Perez,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>United States of America, et al.,<br><br>　　　　　　　Defendants. | No.  CV-22-01100-PHX-DWL (CDB)<br><br><br>**ORDER** |

## INTRODUCTION

Jorge Felix Ibarra-Perez ("Plaintiff") fled Cuba to escape persecution. Plaintiff initially traveled to Mexico, where he was extorted by Mexican law enforcement authorities. Plaintiff then entered the United States and applied for asylum, but an immigration judge ("IJ") denied his asylum application, granted him only a limited form of relief known as withholding of removal (which simply prevented his removal to Cuba), and otherwise authorized his removal from the United States. The IJ explained that she believed this result was compelled by a then-applicable regulation known as the Transit Ban, which precluded certain individuals who had passed through other countries before coming to the United States from obtaining asylum.

A few days after the issuance of the removal order, agents of U.S. Immigration and Customs Enforcement ("ICE") executed the order by removing Plaintiff to Mexico, even though Plaintiff told them he feared persecution there. Plaintiff's fears were prescient, as he was threatened by Mexican gang members soon after his return to Mexico. As a result,

Plaintiff quickly entered the United States again. Plaintiff was again placed in immigration proceedings, but this time the IJ reopened his case and eventually granted his asylum application, in part due to an intervening Ninth Circuit decision enjoining the enforcement of the Transit Ban.

In this action, Plaintiff has, through counsel, asserted various claims against the United States of America ("Defendant") under the Federal Tort Claims Act ("FTCA"). Plaintiff's overarching theory is that "[t]his case involves extraordinary misconduct by agents of [ICE] who unlawfully prevented [Plaintiff] from pursuing a claim for protection from persecution to which he was legally entitled, and then unlawfully deported him to the very country he feared." (Doc. 1 ¶ 1.) Plaintiff "seek[s] compensation for the harms and losses he suffered as the result of this unlawful deportation." (*Id.* ¶ 4.)

Now pending before the Court is Defendant's Rule 12(b)(1) motion to dismiss this action for lack of subject-matter jurisdiction. (Doc. 46.) Defendant contends that because all of Plaintiff's claims are, at bottom, challenges to the legality of his removal order or the execution of the removal order, they fall within the ambit of 8 U.S.C. § 1252, which contains various provisions that strip federal district courts of jurisdiction to hear such claims. (*Id.*) The motion is fully briefed. (Docs. 58, 63.) For the following reasons, the motion is granted. Although the hardship Plaintiff endured is tragic and deserving of sympathy, Congress has made clear that federal district courts lack jurisdiction to entertain the sort of claims he wishes to pursue here.

**BACKGROUND**

In his four-count complaint, Plaintiff asserts FTCA claims for false imprisonment, negligence, abuse of process, and intentional infliction of emotional distress ("IIED"). (Doc. 1.) In support of these claims, Plaintiff alleges the following facts:

In April 2019, Plaintiff fled Cuba due to persecution because of his opposition to the Castro regime. (*Id.* ¶ 33.) That same month, Plaintiff arrived in Mexico, where he was extorted by Mexican police officers and other authorities with threats of detention and

deportation to Cuba. (*Id.* ¶¶ 34-36.) Plaintiff's request for asylum in Mexico was denied but he was granted a one-year humanitarian visitor permit. (*Id.* ¶ 37.)

On August 8, 2019, Plaintiff presented himself at the United States port of entry in Nogales, Arizona to apply for asylum. (*Id.* ¶ 39.) Based on the asylum process in effect at that time, Plaintiff was placed on a waiting list. (*Id.*)

On September 14, 2019, Plaintiff returned to the port of entry, was taken into ICE custody, and was placed in removal proceedings. (*Id.* ¶¶ 38-41.)

On October 16, 2019, Plaintiff made an initial appearance before an IJ. (*Id.* ¶ 42.)

On or about January 10, 2020, Plaintiff filed an application for asylum, withholding of removal, and Convention Against Torture ("CAT") protections. (*Id.* ¶ 44.) In his application, Plaintiff stated that Mexico was not a "safe country" for him. (*Id.*) Plaintiff also attached a declaration detailing multiple times he was threatened and extorted by Mexican mafias and gangs, along with articles from the Mexican press showing that Cubans were kidnapped, tortured, and killed in Mexico. (*Id.* ¶ 45.)

On January 10, 2020, the IJ held a hearing on Plaintiff's asylum application. (*Id.* ¶ 48.) The IJ determined that Plaintiff had been persecuted in Cuba on account of his political views, but she denied his request for asylum in the United States and instead granted him withholding of removal to Cuba, a lesser form of protection that only prohibits removal to a designated country. (*Id.* ¶ 49.) The IJ wrote that she would have granted Plaintiff's request for asylum had it not been for the Transit Ban, C.F.R. § 1208.13(c), which at that time barred noncitizens who entered the country through the southern border from obtaining asylum without first seeking and being denied asylum in Mexico or another third country. (*Id.* ¶¶ 43, 49.)[1] Both Plaintiff and ICE counsel waived appeal. (*Id.* ¶ 49.)

---

[1] Plaintiff alleges that he applied for asylum in Mexico and that application was denied. (Doc. 1 ¶ 37.) However, during his initial appearance in immigration court, although Plaintiff answered "yes" when asked whether he had applied for asylum in Mexico, he then answered "No, I received a humanitarian visa for a year" in response to the IJ's follow-up question whether the application was granted or denied. (*Id.* ¶ 42.) The IJ then mentioned the Transit Ban, which had recently gone into effect (*id.* ¶ 43), so it appears she took Plaintiff's second answer to mean he had not applied for asylum in

- 3 -

At no time during Plaintiff's removal proceedings did the IJ or ICE counsel inform him that he could be removed to Mexico, and the IJ did not designate Mexico as an alternative country for removal. (*Id.* ¶ 50.)

On January 14, 2020, an ICE deportation officer sent emails to consular representatives in Mexico, Nicaragua, and Columbia, informing them that Plaintiff had been ordered removed from the United States and inquiring whether they would be willing to accept him. (*Id.* ¶ 52.) Nicaragua and Mexico had previously issued temporary visas to Plaintiff. (*Id.*)

On January 15, 2020, a Mexican consular official responded that Plaintiff could enter Mexico and requested times for Plaintiff's removal to take place. (*Id.* ¶ 53.)

On the afternoon of January 15, 2020, while Plaintiff was still in immigration custody, an ICE agent told Plaintiff he was going to be removed to Mexico, and when Plaintiff objected that he could not go to Mexico and asked if he could instead be sent to Canada or Spain, the officer said he would return with more information but never came back. (*Id.* ¶ 55.) Later that afternoon, another ICE agent told Plaintiff he would be removed to Mexico and gave him paperwork in English to sign, but Plaintiff, who does not read or write English, refused to sign. (*Id.* ¶ 57.) A third ICE agent then arrived with a computer and informed Plaintiff via a Spanish translation program on the computer that Plaintiff would be removed to Mexico, and when Plaintiff said he was afraid to be removed to Mexico, this agent also left without providing more information. (*Id.*) Later the same afternoon, despite Plaintiff's continued objections, ICE agents made Plaintiff get into a van and took him to the ICE office in Florence, Arizona for processing. (*Id.* ¶ 58.) Upon his arrival in Florence, Plaintiff told an ICE agent that he feared going to Mexico, but that agent ignored him. (*Id.* ¶ 59.)

Early the next morning, on January 16, 2020, ICE agents drove Plaintiff to the U.S.-Mexico border, where he was received by Mexican officials and then released into the

Mexico and was therefore barred from seeking asylum in the United States. Plaintiff does not allege that the IJ asked about this issue at his subsequent asylum hearing.

- 4 -

streets of Nogales, Sonora, Mexico without food, shelter, or sufficiently warm clothing and told to look for work. (*Id.* ¶¶ 60-66.) That night, Plaintiff stayed in a poorly heated one-room shelter with about 30 bunk beds and no other amenities, and the next day, January 17, 2020, he left to look for work. (*Id.* ¶ 67.)

As he was walking on January 17, 2020, Plaintiff was stopped and forced at gunpoint into a truck by gang members. (*Id.* ¶ 68-70.) The gang members tried to extort him to become a drug mule or pay them $500 a month to stay in Nogales and told him he could not leave Nogales because they had taken his photo and distributed it to informants throughout the city. (*Id.*) When Plaintiff said he needed to make some calls and would give them an answer the next day, the gang members let him go but said they would find him. (*Id.* ¶ 71.) Plaintiff then went to the Kino Border Initiative's food hall and talked to other migrants, who told him he could either pay the money, work for criminal groups, disappear and end up dead, or turn himself in at the U.S. border. (*Id.*)

While at the Kino Border Initiative facility, Plaintiff met with an attorney from the Florence Immigrant & Refugee Rights Project ("FIRRP"), and with the help of the FIRRP attorney, he presented himself at the Mariposa Port of Entry in Nogales, Arizona that same afternoon. (*Id.* ¶ 78.) At the port of entry, Plaintiff was interviewed by U.S. Customs and Border Patrol ("CBP") officials, and when he expressed fear of returning to Mexico, he was placed in ICE custody pending new removal proceedings. (*Id.* ¶¶ 78-79.)

Plaintiff was initially held in several facilities in Arizona before being transferred to the La Palma Correctional Center in Eloy, Arizona. (*Id.* ¶ 80.) During this time, FIRRP counsel filed several motions with the immigration court, and on March 16, 2020, the IJ terminated the new proceedings and reopened the prior proceedings based on due process concerns related to Plaintiff's removal to Mexico without notice or an opportunity to apply for asylum and/or withholding of removal as to that country. (*Id.* ¶ 82.) The IJ cited *Aden v. Nielsen*, 409 F. Supp. 3d 998 (W.D. Wash. 2019), for the proposition that the United States has an affirmative duty to provide a deportee a meaningful opportunity to be heard before being removed to any potential country. (*Id.*)

On July 16, 2020, the IJ granted Plaintiff's application for asylum based on a district court decision vacating the Transit Ban regulation and a Ninth Circuit decision enjoining enforcement of the regulation in four border states, including Arizona. (*Id.* ¶ 83.)

From mid-February to mid-July 2020, when he was granted asylum, Plaintiff remained at the La Palma Correctional Center. (*Id.* ¶ 85.) During his detention there, the La Palma Correctional Center had one of the largest outbreaks of COVID-19 of any ICE detention center in the country, and Plaintiff was placed in medical isolation for flu-like symptoms even though he tested negative for COVID-19. (*Id.* ¶¶ 85-86.) Plaintiff also received substandard medical treatment for kidney stones, causing him excruciating pain, and he missed being with his family members in Florida for a memorial service for his mother (who died in Cuba while he was detained). (*Id.* ¶ 86.)

Plaintiff alleges that Defendant's actions of deporting him to Mexico without an opportunity to pursue a protection claim were the proximate cause of considerable emotional, physical, and mental distress. (*Id.* ¶ 87.) Plaintiff's alleged injuries include stress and anxiety from the trauma he already suffered in Mexico; from the threats of deportation from Mexico to Cuba, where he would face abuse, torture, forced disappearance, prolonged detention, and/or death; and from his detention at the La Palma Correctional Center, where he was confined in medical isolation, endured excruciating pain from kidney stones, and was forced to grieve his mother's death alone. (*Id.* ¶ 90.) As remedies, Plaintiff seeks compensatory damages, costs, and attorneys' fees. (*Id.* at 27.)

## LEGAL STANDARD

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a defendant may move to dismiss an action for a "lack of subject-matter jurisdiction." *Id.* "Under Rule 12(b)(1), a defendant may challenge the plaintiff's jurisdictional allegations in one of two ways. A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they are insufficient on their face to invoke federal jurisdiction. . . . A 'factual' attack, by contrast, contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014)

1  (citations omitted). "With a factual Rule 12(b)(1) attack, . . . a court may look beyond the
2  complaint . . . without having to convert the motion into one for summary judgment . . .
3  [and] need not presume the truthfulness of the plaintiffs' allegations." *White v. Lee*, 227
4  F.3d 1214, 1242 (9th Cir. 2000) (internal citations omitted).
5        The plaintiff bears the burden of establishing that subject-matter jurisdiction exists.
6  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Leite*, 749 F.3d at
7  1121. Additionally, courts "have an independent obligation to determine whether subject-
8  matter jurisdiction exists." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). *See also*
9  Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter
10 jurisdiction, the court must dismiss the action.").

**DISCUSSION**

12       Defendant argues that the Court lacks subject-matter jurisdiction over Plaintiff's
13 claims for two overlapping reasons. First, Defendant invokes 8 U.S.C. § 1252(g), which
14 strips the federal courts of jurisdiction to consider any claim arising from the decision of
15 the Attorney General or his or her delegee to execute a final removal order, and argues that
16 § 1252(g) is implicated here because all of Plaintiff's claims are, at bottom, challenges to
17 ICE's execution of the IJ's removal order. (Doc. 46 at 5-7.) Second, Defendant argues
18 that to the extent Plaintiff seeks to challenge the legality of the removal order itself, any
19 such challenge is barred by 8 U.S.C. §§ 1252(a)(5) and (b)(9), which provide that any
20 challenge to a removal order can only be brought in a petition for review of removal
21 proceedings filed in the appropriate Court of Appeals. (*Id.* at 7-8.)

22 I.    <u>8 U.S.C. § 1252(g)</u>

23       As noted, Defendant's first challenge turns on 8 U.S.C. § 1252(g), which provides
24 that "[e]xcept as provided in this section and notwithstanding any other provision of law
25 . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien
26 arising from the decision or action by the Attorney General to commence proceedings,
27 adjudicate cases, or execute removal orders against any alien under this chapter." *Id.* The
28 Supreme Court has clarified that § 1252(g) does not serve as a "zipper clause" that bars

judicial review of any decisions or actions that occur as part of the removal process—rather, it "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999).

In Defendant's view, this action implicates § 1252(g) because "[a]ll of the counts for relief in Plaintiff's Complaint—negligence, false imprisonment, abuse of process, and intentional infliction of emotional distress—are based entirely on the allegation that he was unlawfully removed to Mexico, and that in doing so, Defendant committed these alleged torts." (Doc. 46 at 1.) Defendant contends that "there is not a single allegation of tortious conduct in the Complaint which is not premised on ICE's execution of the IJ's final removal order in removing Plaintiff to Mexico. Therefore, the entire suit is barred by section 1252(g)." (*Id.* at 5.)

In response, Plaintiff argues that his claims "fall outside the ambit of § 1252(g)'s bar to reviewing challenges to the 'execution of removal orders'" because the complaint "is devoid of any allegations that challenge the execution of the 2020 removal order. Rather, the Complaint challenges ICE's failure to provide Mr. Ibarra-Perez with mandatory procedural protections that would have prevented his deportation to Mexico based on his claim of fear of persecution in that country. Notably, no order of removal to Mexico ever existed, and the government never sought to designate nor did the IJ designate Mexico as a country to which he could be deported in removal proceedings. Moreover, Mr. Ibarra-Perez does not ask this Court to set aside, vacate, or even judicially review the 2020 order." (Doc. 58 at 7.) Plaintiff continues: "[E]ven assuming arguendo that Mr. Ibarra-Perez's claims could 'technically' relate to the 2020 order (which they do not), the analysis would not end there. Rather, . . . § 1252(g) strips jurisdiction over only discretionary decisions commencing proceedings, adjudicating cases, and executing removal orders. Here, taking the allegations in the complaint as true, Mr. Ibarra-Perez expressed his fear of deportation to Mexico in his removal proceedings—which was documented in his immigration file—and subsequently verbally expressed this fear to several deportation officers immediately

prior to his deportation to Mexico. ICE agents had no discretion to fail to provide him mandatory procedural protections; specifically, they had no discretion to ignore his asserted fear of deportation to Mexico or to deny him a meaningful opportunity to pursue his fear-based claim." (*Id.* at 9-10, citing 8 U.S.C. § 1231(b)(3)(A).)

Defendant has the better of this argument. The bottom line is that the IJ issued a removal order on January 10, 2020 and ICE agents executed that order on January 16, 2020 by removing Plaintiff to Mexico. Although Plaintiff advances an array of theories as to why the ICE agents should not have executed the removal order in that fashion—some of which are premised on misunderstandings of the applicable statutory and regulatory provisions, as discussed in subsequent paragraphs of this order—all of those theories fundamentally relate to the actions of the ICE agents (as delegees of the Attorney General) in *executing a removal order*. As other courts have concluded, § 1252(g) bars such claims. *See, e.g., Rivera Ramirez v. United States*, 2018 WL 6016276, *3 (C.D. Cal. 2018) ("Plaintiff alleges that while in custody of ICE, unknown officers reinstated a non-existent removal order and executed such unlawful order upon plaintiff by removing him to Mexico on that date. This allegation, which is the basis for all of Plaintiff's claims, plainly falls within the ambit of § 1252(g) because it arises from ICE's decision to execute a removal order. Even if the order was unlawful, as Plaintiff alleges, because he was a lawful permanent resident and not subject to any removal proceedings, § 1252(g) shields Plaintiff's claims from judicial review. In fact, courts have found that they lack jurisdiction to hear claims arising out of removal proceedings, even if the removal order was genuinely erroneous.") (cleaned up).

This conclusion is consistent with, and indeed compelled by, the Ninth Circuit's decision in *Arce v. United States*, 899 F.3d 796 (9th Cir. 2018), which Plaintiff incorrectly cites as an authority supporting his position. In *Arce*, the Ninth Circuit ordered a stay of an IJ's removal order but ICE then executed the removal order despite the stay, removing the plaintiff to Mexico. *Id.* at 799. The plaintiff, in turn, brought an FTCA action "for damages suffered as a result of the wrongful removal" and the government moved to

dismiss based on § 1252(g). *Id.* The Ninth Circuit concluded that § 1252(g) was inapplicable because the plaintiff's claims arose "not from the execution of the removal order, but from the violation of our court's order. Indeed, the stay of removal temporarily suspended the source of the Attorney General's authority to act, resulting in a setting aside of the authority to remove Anaya." *Id.* at 800 (cleaned added). Notably, the court added: "Put differently, but for the violation of the stay of removal, Anaya would not have an FTCA claim at all." *Id.* Later in the opinion, the court again emphasized that it was the government's violation of the stay order that rendered § 1252(g) inapplicable: "[T]aken to its logical conclusion, the government's reading would significantly circumscribe our authority to enforce our orders. . . . There is no support for the government's claim that Congress intended to prohibit federal courts from enforcing any court order so long as it is related to or in connection with an immigration proceeding." *Id.* at 801.

This case is distinguishable from *Arce* for the obvious reason that the IJ's removal order, issued on January 10, 2020, had not been stayed (or otherwise invalidated) at the time it was executed by ICE agents on January 16, 2020. To the contrary, Plaintiff waived any right of appeal as part of the proceedings on January 10, 2020. It follows that, under § 1252(g) as interpreted in *Arce*, Plaintiff cannot assert an FTCA claim premised on the ICE agents' execution of the order: "[B]ut for the violation of the stay of removal, Anaya would not have an FTCA claim at all." *Arce*, 899 F.3d at 800.[2]

For similar reasons, Plaintiff's reliance on *Enriquez-Perdomo v. Newman*, 54 F.4th 855 (6th Cir. 2022), is misplaced. There, an IJ issued a removal order as to the plaintiff but United States Citizenship and Immigration Services ("USCIS") subsequently granted her a deferral of removal pursuant to the Deferred Action for Childhood Arrivals

---

[2] Plaintiff seems to suggest that this passage from *Arce* is dicta that is inconsistent with *Arce*'s broader "rationale." (Doc. 58 at 13.) Any such argument is unavailing. Because the cited passage from *Arce* was germane to the resolution of the case and a product of reasoned consideration, it serves as binding circuit law this Court must follow. *United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019) ("Where a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense. In other words, well-reasoned dicta is the law of the circuit . . . .") (cleaned up).

("DACA") program. *Id.* at 858. Nevertheless, despite being aware that the plaintiff "had received DACA," ICE agents arrested her and detained her for a period of days. *Id.* at 858-59. The plaintiff, in turn, brought a *Bivens* action against the ICE agents, who moved to dismiss under § 1252(g) on the ground that the plaintiff's claims arose from the execution of a removal order. *Id.* at 859-61. The Sixth Circuit disagreed with the defendants, concluding that § 1252(g)'s restriction against hearing claims stemming from "executing removal orders" meant that the removal order had to be "executable" and that, because the plaintiff had received affirmative protection from removal under DACA, "§ 1252(g) d[id] not preclude [her] claims because her removal order was not executable." *Id.* at 863-64. In a footnote, the Court clarified that its conclusion that the removal order was not "executable," and therefore outside the reach of § 1252(g), was limited to "the circumstances of this case." *Id.* at 864 n.5. Plaintiff's case, of course, does not fall within the limited "circumstances" at issue in *Enriquez-Perdomo*—Plaintiff has not alleged that his immigration status somehow changed between the issuance of his removal order and the challenged actions of ICE agents in executing that order. Thus, even if *Arce* weren't binding, *Enriquez-Perdomo* would not support Plaintiff's position.

Plaintiff also relies on *Jennings v. Rodriguez*, 583 U.S. 281 (2018), in which the Supreme Court determined that it had jurisdiction to decide whether immigration detainees had a right to periodic bond hearings despite 8 U.S.C. § 1252(b)(9), which restricts judicial review of "all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter." The Court concluded that claims "arising from" actions taken or proceedings brought "to remove an alien from the United States" did not encompass all claims that merely resulted from the fact of being in custody, which it reasoned would have "staggering results," going so far as to bar any civil rights claims challenging a detainee's conditions of confinement that were otherwise unrelated to any decisions and actions pertaining to removal proceedings. *Jennings*, 583 U.S. at 294. Because the respondents in that action were "not asking for review of an order

of removal," "not challenging the decision to detain them in the first place or to seek removal," and "not even challenging any part of the process by which their removability will be determined," the Court concluded that the restriction in § 1252(b)(9) did not apply. *Jennings*, 583 U.S. at 294.

The concerns that *Jennings* expressed about giving an expansive meaning to the phrase "arising from" in § 1252(b)(9) are inapplicable here because § 1252(g) does not contain this same term and the Court is not being asked to address whether deciding a detainee's ancillary rights during detention, such as the right to periodic bond hearings or the right to humane conditions of confinement, would impermissibly impinge on the government's decisions and actions during removal proceedings. Instead, Plaintiff's FTCA claims and alleged injuries are wholly based on, and would not exist but for, the actions of ICE agents "to execute a removal order" by removing him to Mexico. The plain text of § 1252(g), as well as the reasoning and holdings of *Reno* and *Arce,* make clear that claims based on such actions are barred from judicial review.

Plaintiff's reliance on *United States v. Hovsepian*, 359 F.3d 1144 (9th Cir. 2004), is also misplaced. There, the Ninth Circuit concluded that the district court was not barred under § 1252(g) from issuing an injunction enjoining the INS from retroactively applying changes in the immigration laws to remove Hovsepian, reasoning that "[t]he district court may consider a purely legal question that does not challenge the Attorney General's discretionary authority, even if the answer to that legal question—a description of the relevant law—forms the backdrop against which the Attorney General later will exercise discretionary authority." *Id.* at 1156. *Hovsepian* does not support Plaintiff's position because this action does not raise pure legal questions that merely form the backdrop to removal proceedings—instead, this action would require the Court to adjudicate claims based on past actions of ICE agents directly covered by § 1252(g).

Although the analysis regarding § 1252(g) arguably does not need to go any further in light of these conclusions, the Court also notes that some of Plaintiff's arguments as to why ICE agents should not have executed (or were legally barred from executing) his

removal order are premised on misunderstandings of the statutory and regulatory provisions he cites in support of those arguments. For example, one of Plaintiff's arguments is that because he expressed a fear of persecution in Mexico to the ICE agents as they were in the process of executing the removal order, those agents were required under 8 U.S.C. § 1231(b)(3)(A) to halt the removal process and provide him with various procedural protections. (Doc. 58 at 9-10 [citing § 1231(b)(3)(A) for the proposition that because Plaintiff "verbally expressed this fear to several deportation officers immediately prior to his deportation to Mexico," the "ICE agents had no discretion to fail to provide him mandatory procedural protections; specifically, they had no discretion to ignore his asserted fear of deportation to Mexico or to deny him a meaningful opportunity to pursue his fear-based claim"].) Plaintiff continues: "Because this provision applies 'notwithstanding' §§ 1231(b)(1) and (2), ICE lacks authority to remove an individual to an alternate country if they have a fear claim, even if that alternate country is willing to accept them." (*Id.* at 2-3.)

As Defendant correctly notes (Doc. 63 at 6-7), the problem with Plaintiff's argument on this point is that § 1231(b)(3)(A) only bars an alien's removal to a particular country "*if the Attorney General decides* that the alien's life or freedom would be threatened in that country." *Id.* (emphasis added).[3] At the time of Plaintiff's removal to Mexico on January 16, 2020, the Attorney General (acting through the Attorney General's designee, the IJ) had never made a finding that Plaintiff's life or freedom would be threatened in Mexico.

---

[3]      Although Plaintiff misunderstands the scope and applicability of § 1231(b)(3)(A), he correctly acknowledges that "[w]here, as here, an IJ grants the noncitizen withholding of removal to the only country designated by the IJ, ICE may attempt removal to an alternate country pursuant to 8 U.S.C. § 1231(b)(1) and (2)" subject to the restrictions of § 1231(b)(3)(A). (Doc. 58 at 2.) Thus, it is of no moment, at least in relation to the conduct of the ICE agents executing the January 10 removal order, that the order did not expressly designate Mexico as potential country of removal. Under § 1231(b)(2)(E), which is entitled "Additional Removal Countries," some of the potential alternative countries of removal are "[t]he country from which the alien was admitted to the United States," "[t]he country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States," and "[a] country in which the alien resided before the alien entered the country from which the alien entered the United States." Accordingly, the ICE agents executing the removal order could permissibly remove Plaintiff to Mexico in light of the IJ's grant of withholding of removal only as to Cuba (and failure to grant withholding of removal as to Mexico).

To the contrary, the only such finding at that time related to Cuba.[4]

Finally, and in a related vein, there is no merit to Plaintiff's contention that the regulations set forth at 8 C.F.R. § 1240.10(f) and § 1240.12(d) support his claim against the ICE agents who executed his removal order. Those provisions apply to removal hearings and require *IJs* to notify an alien of the country or alternative countries to which the alien may be removed, to provide an alien an opportunity to designate a country of removal in the first instance, and to identify the country or alternative countries to which an alien may be removed if the alien fails to designate a country or if the alien's designated country will not accept the alien into its territory. Those regulations do not, in contrast, place legal obligations on ICE agents executing an IJ's removal order.

II.  <u>8 U.S.C. §§ 1252(a)(5) and (b)(9)</u>

Although the conclusions reached in Part I arguably make it unnecessary to go any further, the Court clarifies, in an abundance of caution, that Defendant's dismissal arguments premised on 8 U.S.C. § 1252(a)(5) and (b)(9) also have merit.

Under § 1252(a)(5), "[n]otwithstanding any other provision of law . . . a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter," with exceptions inapplicable here. *Id.* Similarly, § 1252(b)(9) provides:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of Title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any

---

[4] As discussed in more detail in Part II, to the extent the IJ failed to follow proper statutory and regulatory requirements for designating an alternative country for removal or overlooked Plaintiff's fears about returning Mexico, the proper way to contest her findings and omissions on those points was to appeal (which Plaintiff declined to do), or to move to reopen the proceedings (which Plaintiff eventually did through the help of FIRRP counsel), or perhaps to file a petition for review in the Court of Appeals (which Plaintiff did not do).

       other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

*Id.*

Defendant argues that, under these statutory provisions, a petition for review in the appropriate Court of Appeals was Plaintiff's only way to raise claims that he did not receive proper notice or an opportunity to pursue a claim for relief before his removal to Mexico. (Doc. 46 at 7-8.) Plaintiff responds that these arguments are a red herring because he is not challenging the IJ's order granting him withholding of removal to Cuba, the order did not designate Mexico as a country to which he could be removed, and he is not seeking judicial review of that order. (Doc. 58 at 13-17.)

Plaintiff's position is difficult to reconcile with his repeated assertion that ICE lacked the discretion to remove him to Mexico absent sufficient notice and opportunity to object, which he was entitled to receive during his removal proceedings as a matter of immigration law and due process. (*See, e.g.*, Doc. 58 at 4-5 ["Neither the IJ nor the ICE attorney mentioned, let alone notified Mr. Ibarra-Perez of, the possibility that ICE might deport him to Mexico."]; *id.* at 7 ["[T]he Complaint challenges ICE's failure to provide Mr. Ibarra-Perez with mandatory procedural protections that would have prevented his deportation to Mexico based on his claim of fear of persecution in that country. Notably, no order of removal to Mexico ever existed, and the government never sought to designate nor did the IJ designate Mexico as a country to which he could be deported in removal proceeding."]; *id.* at 10 ["ICE was required to move to reopen his case to allow the IJ to designate Mexico as a country of removal and adjudicate his claim of fear of removal to Mexico."].) At any rate, because the Court has now determined that it is barred under § 1252(g) from hearing claims based on the actions of ICE agents in executing Plaintiff's removal order, Plaintiff's concession that he is not challenging the removal order itself effectively puts an end to his FTCA claims.

Plaintiff also argues, without conceding that § 1252(b)(9) applies, that the Court should adopt the reasoning in *Jennings*, wherein the Supreme Court rejected an overbroad

- 15 -

reading of "arising from" in § 1252(b)(9).  (Doc. 58 at 16.)  Plaintiff does not explain, though, how taking a restrained view of what is meant by "arising from" in § 1252(b)(9) would permit judicial review of the alleged tortious conduct at issue here.

*J.E.F.M. v. Lynch*, 837 F.3d 1026 (9th Cir. 2016), on which Plaintiff also relies, does not change the analysis.  In *J.E.F.M.,* the Ninth Circuit emphasized that §§ 1252(a)(5) and (b)(9) do not "foreclose *all* judicial review of agency actions.  Instead, the provisions channel judicial review over final orders of removal to the courts of appeals." *Id.* at 1031 (emphasis in original).  The court also recognized that "claims that are independent of or collateral to the removal process do not fall within the scope of § 1252(b)(9)." *Id.* at 1032.  But Plaintiff once again fails to explain how any claims based on injuries he allegedly suffered from being removed to Mexico absent proper notice and ability to object are "independent of or collateral to" the removal process.

To illustrate possible claims that fall outside this scope, *J.E.F.M.* noted the "unique situation" in *Singh v. Gonzales*, 499 F.3d 969 (9th Cir. 2007), in which a plaintiff's ineffective-assistance claim arose from counsel's alleged failure to file a timely appeal after the close of removal proceedings and the Ninth Circuit found that this claim was "independent of and collateral to" the removal process because it arose "after a final order of removal had been entered." *Id.*  The Ninth Circuit clarified, though, that "[w]e did not, however, allow Singh to raise a different ineffective assistance of counsel claim that arose before a final order of removal entered and that could and should have been brought before the agency." *Id.* 1032.  Plaintiff appears to liken his claims in this action to those in *Singh* because his removal to Mexico took place after his removal proceedings were over.  (Doc. 58 at 16.)  But as discussed, the statutory and regulatory provisions that require the Attorney General to make findings relative to possible removal countries, upon which Plaintiff repeatedly relies to challenge his removal to Mexico in this action, adhere in the context of removal proceedings before an IJ, not during the execution of the resulting removal order.  Thus, the alleged deficiencies flow directly from Plaintiff's removal proceedings and can only be challenged in the appropriate court of appeals, not in an FTCA

action for money damages.

Plaintiff also makes what is an essence a policy-based argument—that interpreting the statutory provisions at issue here as divesting the Court of jurisdiction over this action would unfairly deprive immigrants of a primary remedy for challenging government abuse. (Doc. 58 at 14-17.) Plaintiff points to the FTCA as evidence that Congress intended to provide money-damages remedies for unlawful government conduct and argues that the FTCA applies to, and has never been repealed in, the immigration context. (*Id.*) Plaintiff also argues that dismissing his claims would deprive him of any other viable remedy to compensate his injuries. (*Id.*)

These arguments are unavailing. Defendant has not challenged the Court's jurisdiction to hear this suit under the FTCA.[5] More important, even assuming Plaintiff's claims might otherwise be actionable under the FTCA and are the type of claims Congress otherwise intended the FTCA to redress, the Court must also give effect to Congress's expressed intent in § 1252(g), § 1252(a)(5), and § 1252(b)(9) to limit judicial review as it relates to certain immigration actions. *Cf. Artuz v. Bennett*, 531 U.S. 4, 10 (2000) ("Whatever merits these and other policy arguments may have, it is not the province of this Court to rewrite the statute to accommodate them.").

…
…
…
…
…
…
…
…

---

[5] In its reply, Defendant notes that Congress included a "discretionary function exception" in the FTCA, which Defendant argues reflects Congress's intent to shield discretionary acts of government employees from suits for money damages. (Doc. 63 at 10.) Defendant did not, however, base its motion on this provision in the FTCA.

Accordingly,

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendant's motion to dismiss (Doc. 46).

(2) Defendant's motion to dismiss (Doc. 46) is **granted**, and the action is dismissed without prejudice for lack of subject-matter jurisdiction.

Dated this 19th day of January, 2024.

Dominic W. Lanza
United States District Judge